TRENKA, Appellant, *v.* MOOS, Respondent.

No. 8635

Submitted March 1, 1946. Decided May 6, 1946.

168 Pac. (2d) 837

Messrs. Hennessey & Hennessey, of Billings, for appellant.
Mr. H. C. Crippen, of Billings, for respondent.

MR. JUSTICE CHEADLE delivered the opinion of the Court.

Action for damages, actual and exemplary, for the wanton killing of a dog. The complaint alleges that at Billings, Montana, on the 28th day of January, 1945, the defendant wantonly and maliciously struck with an axe and killed a dog, the property of the plaintiff, of the value of $500; that because of

the violent, wanton and malicious acts of defendant he should be required to pay damages by way of example. The prayer is for actual damages of $700 and exemplary damages of $1,000.

The answer admits the killing of the dog by defendant; denies that such killing was wanton or malicious, or accomplished with an axe. As a separate defense defendant alleges that at the time and place mentioned in the complaint and immediately before the time when he is alleged to have committed the act complained of, the dog in question was on premises belonging to defendant's wife, and occupied by them as a home, and was in their chicken yard, and was in the act of attacking and killing chickens belonging to defendant and his wife, and that it was reasonably necessary to kill the dog to protect such chickens from serious injury and death by said dog; that defendant thereupon shot and killed said dog, using for such purpose a twenty-two calibre rifle; that in so doing the defendant acted as a reasonable and prudent man, and for the sole and only purpose of protecting his property. By reply the plaintiff denies the material allegations of the separate defense.

The cause was tried by the court sitting with a jury. At the conclusion of the evidence the defendant's motion for a directed verdict in his favor was denied. The jury's verdict was in favor of the defendant and against plaintiff, and judgment was accordingly entered.

Appellant's specifications of error are directed at the trial court's admission and rejection of evidence; its refusal of instructions offered by the plaintiff; and that the evidence is insufficient to justify the verdict and judgment.

Respondent, by cross-assignment, specifies error of the trial court in refusing his motion for a directed verdict, which was based upon the insufficiency of the evidence to support a verdict for plaintiff in two particulars:

1. There is no credible evidence upon which the jury could find that the dog in question had any value.

2. That the evidence is undisputed that the dog, at the time

it was shot by defendant, was in the immediate act of killing defendant's chickens.

The two instructions offered by the plaintiff and refused by the court were as follows:

"13. You are instructed that to justify the killing of a dog for the protection of domestic animals or fowl, the dog must be presently attacking or threatening the animal or fowl, and the fact, if fact it be, that the dog has in the past attacked or threatened the animal or fowl will not justify the killing of the dog, and if you find from the evidence that the defendant's chickens were dead at the time the defendant killed the plaintiff's dog, then the defendant was not justified in killing the plaintiff's dog, and you must find and return your verdict for the plaintiff."

"14. You are instructed that in this case the burden is on the defendant to prove by a preponderance of the evidence not only that he had reasonable cause to believe that plaintiff's dog was proceeding to kill his chickens, but also that it was reasonably neccessary to kill plaintiff's dog in order to protect his chickens.

"You are further instructed that, if you have found from a preponderance of the evidence that defendant had reasonable cause to believe that plaintiff's dog was proceeding to kill his chickens, you must consider the relative values of the plaintiff's dog and the defendant's chickens, as shown by the evidence, in determining whether it was reasonably necessary for defendant to kill plaintiff's dog in defense of his chickens."

The trial court gave its instruction No. 10, without objection, as follows:

"You are instructed that, if you find and believe from a preponderance of the evidence that the dog was in the act of killing defendant's chickens, he was justified in killing her, and, if you so find, your verdict should be for the defendant."

Instruction No. 11 was also given without objection, as follows:

"You are instructed that, in order to warrant the killing of

a dog for the protection of a domestic animal or fowl, the circumstances must be such as to create a reasonable belief that such killing is necessary to prevent injury to the animal or fowl.''

While the record contains much evidence not germane to the issues, that which is material is not conflicting. This may be briefly summarized as follows: The defendant admitted that he killed plaintiff's dog, under these circumstances: On Sunday morning, January 28, 1945, one Wilbur Dethlefsen, a neighbor of defendant, noticed a dog trying to break into defendant's chicken pen; a little later he observed the dog in the pen, with a chicken in its mouth, and reported to defendant the presence of the dog in the pen. Shortly thereafter he returned to the defendant's premises; the dog was then in the coop, where the defendant killed it. The defendant testified that on the morning of the day in question Dethlefsen reported to him, ''There is a dog in your chicken yard killing your chickens.'' ''I walked out and took a look at it. I seen what dog it was. I had seen him around there before, and he had one chicken in action killing it. I went back for the gun, and the neighbor he went home. I went back out, and he was still scuffling with the chicken—it wasn't dead yet, and at that time Mrs. Moos, my wife, she walked up and he jumped against the fence, lunged at her. * * * I was about five feet from the fence then, and there was no other way out of that, I felt it had to be killed. I shot the first shot—

''Q. What was he doing when you shot the first shot? A. He had the chicken in his mouth.

''Q. And then what happened? A. I shot the first shot and he went in the small hole where the chickens come out of the house,—he went through that. By that time a neighbor came over there and walked up behind me, and the gun jammed I had and I called for the other gun. I got two 22 rifles. They brought it out. He said 'catch him behind the ears, that will fix him.' That is what I did.''

612

On cross-examination the defendant testified, with reference to the first and second shots:

"Q. Where did you hit the dog? [Referring to the first shot.] A. Hit him on the head.

"Q Hit him on the head with the gun? A. With the shot.

"Q. What type of shot was that? A. 22.

"Q. Long or short? A. Short.

"Q. Twenty-two short. Did that slug penetrate the dog's head at all? A. Yes.

"Q. Did you see him fall? A. Yes I did.

"Q. Did the dog create any commotion. A. He fell and he went into the chicken coop.

"Q. Did you follow the dog into the chicken coop? A. Yes, after I had the next gun—that gun would not work. I called for the next gun. I didn't go in, pushed the door in, seen him in the corner and let him have the second shot.

"Q. How long after you fired the first shot until you fired the second shot? A. Five minutes."

The witness Dethlefsen testified: "* * * I looked out the window to see what the weather was like and I noticed this dog was in there and had a chicken in his mouth. So I went over and asked Mr. Moos if he knew there was a dog in his chicken coop. He said 'no.' So I went on home. Then just a little while after that I thought I heard a shot. I looked out the window and I seen Mr. Moos standing with the gun. * * * Not by the chicken coop but just outside of the little enclosure where he fed his chickens. So I went over there. In the meantime the dog went into this chicken coop and was over nearer to the back. He opened up the door,—not to the enclosure where he fed them but in the coop where he kept them overnight, and the dog was standing there sort of showing his teeth. I said to Mr. Moos, 'Shoot him behind the ear,' which he did. The dog fell over dead, I suppose, and I went home.'"

Katie Moos, wife of the defendant, testified, as to the firing of two shots by the defendant, but that she could not say how

much time elapsed between. With reference to the actions of the dog at the time the second shot was fired, she testified:

"Q. How many chickens were lying dead on the ground when you first went out there? A. Two.

"Q. Did the dog have the chicken in its mouth when it was killed? A. Well, yes, I think he did.

"Q. Did the dog have the chicken in its mouth ·when the first shot was fired? A. Yes; that is what I meant.

"Q. Did he have the chicken in its mouth when the second shot was fired? A. No.

"Q. Where was that chicken? A. He left it lay and went into the chicken coop."

Testimony of the defendant and other witnesses established that three of defendant's five chickens were killed by the dog at the time and place in question, and that two others escaped from the enclosure before the shots were fired.

The question involved is one of first impression in this jurisdiction, as far as we have been able to discover.

While the general rule is stated in various ways, we believe its statement in 3 C. J. S. Animals, sec. 219, p. 1336, as follows, is representative:

"Whether defense of property is a justification for the killing of a dog depends upon a number of variable facts such as the imminence and nature of the danger, the kind of property in peril, from whom or what the danger proceeds, the relative importance of the harm threatened, and that which is done in defense. Under the common law and under statutes in affirmation thereof, to justify the killing of a dog in defense of property there must be an apparent necessity for the defense, honestly believed to be real, and the acts of defense must in themselves be reasonable, or in other words, it is necessary to show that the danger from its attack was imminent at the time, and that the injury could not otherwise have been prevented. This limitation is not abrogated by a statute which makes it the duty of a game warden to kill dogs injuring or killing domestic animals or fowls. The person protecting his property, however, has

the right to act on the reasonable appearance of things and if he has reasonable cause to believe that necessity for killing the dog exists he is not liable.

"Generally, the right to kill the dog exists only while it is ▮ engaged in the act which outlaws it, and it is not enough that the dog may have worried or killed a domestic animal before, nor that there is a belief or apprehension that he intends to do so, but, although a dog may not be actually engaged in doing mischief, if his conduct is such as to create a reasonable apprehension of serious injury, or a renewal of former attacks, it may be destroyed." See notes 14-21 to the section quoted.

In Sabin v. Smith, 26 Cal. App. 676, 147 Pac. 1180, 1181, it is said: "At the common law the justification for the killing was complete when it appeared that the dog was engaged in worrying and terrifying domestic animals in their own lawful inclosure, and where the necessity of the killing in order to protect the property was apparent." See annotation to Ex parte Minor, 203 Ala. 481, 83 So. 475 in, 10 A. L. R. 687.

The usual case of this character presents a question for the ▮ jury as to whether, under the circumstances of the particular case, a man of ordinary prudence would be reasonably led to believe that it was necessary to kill the dog in order to protect his property. In the Virginia case of Breedlove v. Hardy, 132 Va. 11, 110 S. E. 358, 360 it is said: "No hard and fast rule can be laid down, but in such cases the parties must generally accept the verdict of the jury. While the defendant had the right to kill these dogs, if necessary, in the defense of his property, he had no right to kill them wantonly, or if his property could be reasonably protected without such killings." In State v. Sylvester, 112 Vt. 202, 22 A. (2d) 505, 508, it is said: "To warrant the killing of a dog for the protection of a domestic animal or fowl, the circumstances must be such as to create a reasonable belief that such killing is necessary to prevent injury to the animal or fowl. (Citing cases.)"

Here, the defendant's own evidence shows that at the moment ▮▮ the dog was killed it was in no way molesting or threat-

ening defendant's fowls. Conceding the correctness of defendant's testimony that when he fired the first shot the dog had a live chicken in its mouth, the effect of that shot was to cause it to desist in its attack, so that thereafter no further action was necessary by the defendant in the protection of his property. There appears to have been no justification or necessity for firing the second shot. Under the circumstances shown here the killing, which was accomplished by the second shot, appears to have been entirely unjustified, at least from the standpoint of protection of defendant's property. The record contains nothing from which the jury might have concluded that the killing was justified on humane grounds, that is, putting the animal out of its misery. While the court's instruction No. 11 is not objectionable as an abstract statement of the law, we believe it not applicable to the facts of this case, and should not have been given. Instruction No. 10 likewise is objectionable for the same reason, and for the further reason that it is indefinite as to the element of time of the killing with reference to the attack on the chickens. Since, however, these instructions were given without objection, the trial court will not be held in error on that account.

We think, however, that under the evidence in this case, plaintiff's instruction No. 13 should have been given, and that its refusal by the trial court constituted error. As pointed out, we think that instructions 10 and 11, as given, were erroneous under the circumstances, and palintiff's failure to object thereto has made a decision herein unnecessarily difficult. We think, also, that a motion for a new trial might profitably have been made on the ground of insufficiency of the evidence to justify the verdict.

For other reasons, the cause must be remanded for a new trial. The plaintiff experienced altogether too much difficulty in introducing evidence as to the dog's value. While the plaintiff was finally permitted, as owner, to state that value, very possibly such testimony was weakened by its initial

refusal by the trial court. We think, also that testimony as to value by the witness Eckroth, an expert, was improperly refused. Plaintiff's specifications of error Nos. 5 and 6 were well taken. These refer to testimony by defendant, admitted over objection, as to his knowledge of the dog's previous activities and destructive traits, and as to previous instances of destruction by it. This testimony was clearly hearsay, and for that reason inadmissible, and should have been excluded.

Appellant specifies error in the trial court's refusal to instruct the jury that, "You must consider the relative values of the plaintiff's dog and the defendant's chickens, as shown by the evidence, in determinig whether it was reasonably necessary for defendant to kill plaintiff's dog in defense of his chickens." This proposal was included in the second paragraph of plaintiff's proposed instruction 14, which was properely refused. In the first place, standing alone, it does not correctly state the law, and in the second place we feel that it should properly have been included in a separate instruction. While comparative values of the attacking and the attacked may be a factor to be considered by the jury in determining justification for the killing of a dog, a proper instruction would inform the jury that the comparative values are such as might be reasonably apparent to the defendant at the time of the killing, 3 C. J. S. Animals, sec. 219, Pac. 1337; State v. Sylvester, supra.

The defendant's cross-assignment of error in refusing his motion for a directed verdict, above set out, is not meritorious. We think there was credible evidence as to the value of the dog, found in plaintiff's testimony And the evidence shows that at the time of the killing the dog was not in the immediate act of killing or threatening defendant's chickens.

Unquestionably our laws afford to all the right to the employment of all reasonable means for the protection of their lives, homes and property. Such right, however, is not to be used as a pretext for the wanton destruction of trespassing animals, whose depredations might otherwise be reasonably prevented or discouraged. For the reasons above stated it ap-

pears to us that this question was not fairly presented for determination by the jury.

Since the possible applicability of section 3417.15, Revised Codes, has not been suggested, the provisions of that statute have not been considered in arriving at our decision.

The judgment is reversed, and the cause is remanded with direction to grant a new trial.

Associate Justices Adair and Angstman concur.

Mr. Chief Justice Lindquist not participating.

Mr. Justice Morris (dissenting).

I dissent. The judgment made and given pursuant to the verdict of the jury should be affirmed. Dogs are predatory animals. They prey upon other animal life for a living when not fed by their masters. Dogs running at large are generally regarded as nuisances. The majority in emphasizing the fact that the dog was not in the act of killing at the time of the second shot, would apply to the defendant the same rules as are applied to a defendant in cases of assault by one human being upon another. The dog was a trespasser caught with the evidence of his killing in his possession in the first instance. His master caught in the same sort of act of trespassing and destroying property would have been liable to severe punishment. Maudlin sentiment for a chicken-killing dog is entitled to but little consideration in a court of law. The institution of trial by jury was established and is maintained for the particular purpose of trying cases such as this and courts can perform their obligations no better than to give recognition to the functions of the triers of the facts.

Rehearing denied May 24, 1946.